**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Tonya Canady, on behalf of herself and others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>Bridgecrest Acceptance Corporation,<br><br>Defendant. | No. CV-19-04738-PHX-DWL<br><br>**ORDER** |

In this putative class action, Plaintiff Tonya Canady ("Canady") alleges that Defendant Bridgecrest Acceptance Corporation ("Bridgecrest") violated the Telephone Communications Protection Act, 47 U.S.C. § 227 *et seq*. ("TCPA"), by repeatedly calling her via an automated dialing service and by continuing to make such calls after she requested they stop. (Doc. 1.) Now pending before the Court is Bridgecrest's motion to compel arbitration. (Doc. 17.) Canady filed a response (Doc. 24) and Bridgecrest filed a reply (Doc. 25).[1] For the following reasons, the motion will be denied.

## BACKGROUND

A. <u>Underlying Facts</u>

The facts set forth below are derived from the complaint and from the declarations and other materials attached to Bridgecrest's motion.

---

[1] The reply is 14 pages long. Under LRCiv 7.2(e), "a reply including its supporting memorandum may not exceed eleven (11) pages." Counsel should, in the future, comply with the applicable page limits.

In November 2018, Canady's husband (who is not a party in this action) purchased a truck from Bridgecrest's predecessor in interest. (*Id.* ¶ 7.) As part of that transaction, Canady's husband entered into two agreements: a "Retail Purchase Agreement – Florida" (Doc. 18-1 at 2-3) and an arbitration agreement ("Arbitration Agreement") (Doc. 18-1 at 10-14). He also provided, in his loan application, a phone number ending in 4483, which he identified as his home phone number. (Doc. 18-1 at 6.) In fact, this was (and is) Canady's cell phone number. (Doc. 1 ¶ 5.)

On January 25, 2019, Canady called Bridgecrest (while using the 4438 number) in an attempt to discuss her husband's loan. (Doc. 18 ¶ 10; Doc. 18-1 at 16.) In response, "she was informed that she needed to be added by [her husband] as an authorized third party before Bridgecrest could speak with her regarding the Account." (*Id.*)

On February 13, 2019, Canady's husband called Bridgecrest (while using the 4438 number) to "add[] [Canady] as an authorized third party on the Account and [give] Bridgecrest his verbal authorization to speak with [Canady] regarding the Account." (Doc. 18 ¶ 11; Doc. 18-1 at 18.)

It is undisputed that, after February 13, 2019, Bridgecrest placed multiple phone calls to Canady at the 4438 number. (Doc. 1 ¶¶ 10-14 [complaint]; Doc. 18 ¶ 11; Doc. 18-1 at 20-21 [call logs].) Canady alleges that, during one such call on March 21, 2019, she "instructed [Bridgecrest] to stop calling her, thereby revoking any alleged consent that [Bridgecrest] could claim to have to call [her] cell phone number," yet "[d]espite [this] instruction to no longer call, [Bridgecrest] continued to call the 4438 number using an automated telephone dialing system or pre-recorded messages on numerous occasions thereafter." (Doc. 1 ¶¶ 10, 12.)

B.   The Arbitration Agreement

The Arbitration Agreement requires Canady's husband and "any of [his] heirs or personal representatives" to resolve any claims or disputes with Bridgecrest through "BINDING ARBITRATION." (Doc. 18-1 at 10.) Under the Arbitration Agreement, a "Claim" is defined as "any claim, dispute or controversy between you and us arising from or related to" various subjects, including "The Contract," "The vehicle," "The relationship

- 2 -

resulting from the Contract," "Your credit application," "The . . . servicing of the Contract," and "The collection of amounts you owe us." (*Id*. at 11.) A "Claim" "has the broadest possible meaning" and "includes claims of every kind and nature," including "third-party claims, statutory claims, contract claims, [and] negligence and tort claims (including claims of fraud and other intentional torts)." (*Id*.)

The Arbitration Agreement further specifies that "a 'Claim' does not include a dispute about the validity, enforceability, coverage or scope of [the Arbitration Agreement] . . . ; any such dispute is for a court, and not an arbitrator to decide." (*Id*.) The Arbitration Agreement also explains that, "[b]ecause the Contract involves a transaction in interstate commerce, the Federal Arbitration Act ('FAA') governs" to the extent applicable. (*Id*. at 13.) Finally, the Arbitration Agreement provides that "[t]he arbitrator shall apply the applicable substantive law consistent with the FAA," but it does not specify which state's substantive law is applicable. (*Id*.)

**ANALYSIS**

Bridgecrest seeks to compel arbitration of Canady's TCPA claim. First, Bridgecrest argues that, although Canady did not sign the Arbitration Agreement, there are two independent reasons why she should be deemed bound by it: (a) she qualifies as her husband's "personal representative," and (b) she is seeking to exploit the underlying contract and therefore should be equitably estopped from avoiding its burdens. (Doc. 17 at 8-13; Doc. 25 at 6-14.) Second, Bridgecrest argues that Canady's TCPA claim falls within the scope of the Arbitration Agreement because the Agreement encompasses all claims, including "statutory claims," "related to" the servicing of her husband's truck loan and the calls at issue were related to that subject. (Doc. 17 at 13-14; Doc. 25 at 2-6.)[2] Canady responds that she does not qualify as a "personal representative," equitable estoppel is inapplicable, and her TCPA claim falls outside the scope of the Arbitration Agreement. (Doc. 24.)

---

[2] Bridgecrest also argues that the Arbitration Agreement is valid and that Canady must proceed individually in the arbitration while this action is stayed. (Doc. 17 at 6-8, 14-15.) Canady does not challenge those arguments in her response, instead focusing on the other arguments identified above.

- 3 -

As explained below, the Court agrees with Canady that she is not bound by the Arbitration Agreement. Thus, there is no need to resolve whether her TCPA claim would otherwise fall within the Agreement's scope.

I.  Whether Canady Is Bound By The Arbitration Agreement

Bridgecrest's motion focuses on the liberal federal policy favoring arbitration. (Doc. 17 at 7.) However, when addressing the antecedent question of "whether a particular party is bound by [an] arbitration agreement . . . the liberal federal policy regarding the scope of arbitrable issues is inapposite." *Rajagopalan v. NoteWorld, LLC*, 718 F.3d 844, 847 (9th Cir. 2013) (quotation omitted). To resolve that question, courts must apply state contract law. *See, e.g., Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 631 (2009) (requiring courts to apply "state contract law" when determining whether "a written arbitration provision is made enforceable against (or for the benefit of) a third party"); *Rajagopalan*, 718 F.3d at 847 ("'[T]raditional principles of state law' determine whether a contract [may] be enforced by or against nonparties to the contract through . . . third-party beneficiary theories . . . and estoppel.") (quotation omitted).

A.  **Choice Of Law**

Of course, "[b]efore a federal court may apply state-law principles . . . it must determine which state's laws to apply." *Pokorny v. Quixtar, Inc.*, 601 F.3d 987, 994 (9th Cir. 2010). Here, neither party seriously grapples with the choice-of-law question. Canady suggests that Arizona law applies but offers no reasoning in support of this suggestion (beyond her observation, in a footnote, that Bridgecrest appears to believe Arizona law is applicable). (Doc. 24 at 14 n.3.) Moreover, Bridgecrest rejects this assumption in its reply, stating, also in a footnote, that "[d]espite Plaintiff's contrary assertion, Bridgecrest does not concede that Arizona law applies to this dispute. Rather, . . . federal common law mandates the conclusion that Plaintiff should be compelled to arbitrate." (Doc. 25 at 9 n.8.)

When, as here, a case is in federal court pursuant to federal question jurisdiction, "federal common law choice-of-law rules apply." *Huynh v. Chase Manhattan Bank*, 465 F.3d 992, 997 (9th Cir. 2006). *See also Chan v. Soc'y Expeditions, Inc.*, 123 F.3d 1287,

1297 (9th Cir. 1997) ("Federal common law applies to choice-of-law determinations in cases based on federal question jurisdiction . . . ."); *Daugherty v. Experian Info. Solutions, Inc.*, 847 F. Supp. 2d 1189, 1194 (N.D. Cal. 2012) ("Although the general rule is 'that a federal court sitting in diversity applies the conflict-of-law rules of the state in which it sits,' jurisdiction in this case is based on federal question, not diversity. Therefore, federal common law applies to the choice-of-law rule determination.") (citation omitted). "Federal common law follows the approach outlined in the Restatement (Second) of Conflict of Laws." *Huynh,* 465 F.3d at 997.[3] And the relevant provision of the Restatement is Section 188, which applies where, as here, the parties have not made an effective choice of law in the underlying contract.[4] Section 188 provides as follows:

> (1) The rights and duties of the parties with respect to an issue in contract are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the transaction and the parties under the principles stated in § 6.
>
> (2) In the absence of an effective choice of law by the parties (see § 187), the contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include: (a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicile, residence, nationality, place of incorporation and place of business of the parties. These contacts are to be evaluated according to their relative importance with respect to the particular issue.
>
> (3) If the place of negotiating the contract and the place of performance are in the same state, the local law of this state will usually be applied, except as otherwise provided in §§ 189-199 and 203.

*Id.*

---

[3] Arizona also follows the Restatement (Second) of Conflict of Laws. *See, e.g., Cardon v. Cotton Lane Holdings, Inc.*, 841 P.2d 198, 202 (Ariz. 1992); *In re W. United Nurseries, Inc.*, 2000 WL 34446155, *7 (D. Ariz. 2000). Thus, even if the Court had applied the forum state's choice-of-law rule instead of federal common law's choice-of-law rule, the analysis would be the same.

[4] As noted, although the Arbitration Agreement provides that "[t]he arbitrator shall apply the applicable substantive law consistent with the FAA" (Doc. 18-1 at 13), it doesn't specify that any particular state's laws will serve as the applicable substantive law.

- 5 -

Here, the application of the factors identified in subsection (2) overwhelmingly supports the conclusion that Florida law is applicable. Canady alleges in the complaint that she is a citizen of Florida (Doc. 1 ¶ 3) and the materials submitted by Bridgecrest suggest that Canady's husband is a Florida resident (Doc. 18-1 at 6 [credit application, reflecting Florida driver's license]). Additionally, those materials suggest the truck purchase took place at a dealership located in Orange Park, Florida (Doc. 18-1 at 2 [purchase agreement]), and the purchase agreement and Arbitration Agreement were each signed by a representative of the dealership, which suggests they were negotiated and executed in Florida (Doc. 18-1 at 3, 14). The only fleeting connection to Arizona is that Bridgecrest, which is headquartered in Arizona (Doc. 1 ¶ 2, 4), happened to "receive[] the loan by assignment from its affiliate" (*i.e.,* the entity that operates the Florida dealership) and thereafter placed phone calls to Canady (who was presumably in Florida) in an effort to collect on the loan (Doc. 17 at 1). Thus, factors (a), (b), and (d) (place of contract execution, place of contract negotiation, and location of subject matter of contract) all unambiguously support the application of Florida law, while factor (c) (place of performance) likely supports the application of Florida law and is, at most, a mixed bag[5] and factor (e) (location of parties) is likewise mixed. Florida law applies in this circumstance.

B.      **"Personal Representative"**

Bridgecrest contends that Canady is bound by the Arbitration Agreement because she agreed to act as an authorized third party on her husband's behalf. (Doc. 17 at 8-10.) According to Bridgecrest, this means that Canady falls within "the term[] of the Agreement which defines 'You' as Mr. Canady and/or any of his 'heirs or personal representatives.'" (*Id.* [citing Doc. 18-1 at 10].)

---

[5] *Ingenco Holdings, LLC v. Ace Am. Ins. Co.*, 921 F.3d 803, 810-11 (9th Cir. 2019) ("[C]ourts applying Section 188 have concluded . . . that '[w]hen the contract is one of payment, the place of performance seems, in truth, of no particular consequence.' Here, the place of performance factor is neutral, as payment took place in Virginia but adjustment took place in Washington. In any event, this factor merits little weight.") (citation omitted).

- 6 -

This argument lacks merit. "The 'personal representative' under Florida law is a term of art . . . . In Florida, a 'personal representative' means the 'fiduciary appointed by the court to administer the estate and what has been known as an administrator . . . or executor.'" *Opis v. Mgmt. Resources, LLC v. Dudek*, 2011 WL 6024092 (N.D. Fla. 2011) (citations omitted). *See also Hill v. Davis*, 70 So.3d 572, 576 (Fla. 2011) (discussing specific statutory requirements for personal representatives under Florida law). This term is not, as Bridgecrest would have it, some sort of loose synonym for any person who is authorized to help another person.[6]

Accordingly, the Court declines to find that Canady is bound by the Arbitration Agreement because she qualifies as the "personal representative" of her husband, the signatory.

C. **Equitable Estoppel**

Alternatively, Bridgecrest argues that Canady should be estopped from avoiding the arbitration agreement because "a non-signatory may be compelled to arbitrate when, as here, the non-signatory 'knowingly exploits' the benefits of the agreement and receives benefits flowing directly from the agreement." (Doc. 17 at 10.) In support of this estoppel theory, Bridgecrest cites *Benson v. Case De Capri Enters. LLC*, 2019 WL 3430159 (D. Ariz. 2019), as well as several unpublished orders from other courts compelling non-signatories to arbitrate TCPA claims. (Doc. 17 at 10-13.)

These arguments are unavailing. As an initial matter, none of the cases cited by Bridgecrest involved the application of Florida law. And in Florida, "[t]hird persons who are not parties to an arbitration agreement generally are not bound by the agreement." *Mendez v. Hampton Ct. Nursing Center, LLC,* 203 So.3d 146, 148 (Fla. 2016). True, Florida does recognize some exceptions (*id.* at 148-51), but it appears to apply those exceptions much more narrowly that the jurisdictions whose law was applied in Bridgecrest's cases. For example, in Florida, "the third-party beneficiary doctrine enables

---

[6] *See also* Black's Law Dictionary (11th ed. 2019) ("Personal representative. (18c) Someone who manages the legal affairs of another because of incapacity or death, such as the executor of an estate. Technically, an executor is a personal representative named in a will, while an administrator is a personal representative not named in a will.").

a non-contracting party to enforce a contract against a contracting party—not the other way around. The third-party beneficiary doctrine does not permit two parties to bind a third—without the third party's agreement—merely by conferring a benefit on the third party." *Id.* at 149. Similarly, although Florida courts recognize that "principles of equitable estoppel sometimes allow a non-signatory to compel arbitration against someone who *had* signed an arbitration agreement," *Beck Auto Sales, Inc. v. Asbury Jax Ford, LLC*, 249 So.3d 765, 767 (Fla. Ct. App. 2018), it does not appear that Florida courts apply this doctrine to estop non-signatories—at a minimum, Bridgecrest has cited no Florida cases supporting this outcome.

In a case virtually identical to this one, a federal district court in Florida refused to require the wife of a man who had signed an arbitration agreement (as part of a mattress lease agreement) to arbitrate her claim that the leasing company violated the TCPA by placing robocalls to her cell phone in an effort to collect on her husband's unpaid debt. *Ray v. NPRTO Florida, LLC*, 322 F. Supp. 3d 1261 (M.D. Fla. 2017). Even though the wife had previously agreed—just as Canady agreed here—to speak with the leasing company about her husband's debt, the court concluded she could not be compelled to arbitrate under Florida law. *Id.* at 1262-63. The Eleventh Circuit affirmed, noting along the way that the defendant (just like Bridgecrest here) "did not cite any Florida cases to the district court in its motion" to compel arbitration. *Ray v. NPRTO Florida, LLC*, 743 Fed. App'x 955, 957 (11th Cir. 2018).

For these reasons, Bridgecrest's heavy emphasis on *Benson* is misplaced. That case turned on nuances of Arizona's law of equitable and direct-benefits estoppel, *see Benson*, 2019 WL 3430159 at *4-5, but Florida law appears to differ from Arizona law with respect to those doctrines. Additionally, the plaintiffs in *Benson* were clearly attempting to exploit the benefits of the underlying contract (between a skilled nursing facility and insurance company) that contained the arbitration clause—they were seeking to step into the shoes of the nursing facility and collect insurance proceeds that arguably were owed to the nursing facility under the terms of the contract. *Id.* at *5 ("[T]he type of garnishment claim at issue here is in substance a claim . . . against the liability insurers for breaching their

obligations under the insurance policies.") (quotation omitted). Here, in contrast, Canady's TCPA claim is not somehow derivative of her husband's rights under his contractual agreements with the car dealership. *See also Ray*, 322 F. Supp. 3d at 1263 ("Plaintiff's claims for violation of the . . . TCPA are not claims to enforce the Lease, and therefore do not bind Plaintiff to the arbitration agreement in the Lease."); *Rahmany v. T-Mobile USA Inc.*, 717 Fed.App'x. 752, 753 (9th Cir. 2018) (reversing district court's order compelling non-signatory to arbitrate TCPA claims and emphasizing that "[e]quitable estoppel is inapplicable because Rahmany's allegations reveal no claim of any violation of any duty, obligation, term or condition imposed by the [contract containing the arbitration clause]") (quotation omitted)[7]

Accordingly, **IT IS ORDERED** that Bridgecrest's motion to compel arbitration (Doc. 17) is **denied**.

Dated this 23rd day of April, 2020.

Dominic W. Lanza
United States District Judge

---

[7] Because Canady is not seeking to exploit the benefits of her husband's contract, it also follows that she cannot be bound to the Arbitration Agreement under traditional agency-law principles. As an initial matter, Bridgecrest forfeited any agency-law argument by failing to develop it in any depth until its reply. (*Compare* Doc. 17 at 8-10 [discussing agency law only as it relates to why Canady should fall within the contractual definition of "personal representative"] *with* Doc. 25 at 7-8 & n.6 [seemingly raising agency law as standalone basis for relief].) The argument also fails on the merits. *Cf. Oudani v. TF Final Mile LLC,* 876 F.3d 31, 37-38 (1st Cir. 2017) (non-signatory could not be compelled to arbitrate wage-and-hour claim, even though it acted as the "agent" of the signatory in certain other contexts, because the wage-and-hour claim was not derivative of the signatory's contractual rights). In *Fi-Evergreen Woods, LLC v. Estate of Robinson*, 172 So.3d 493 (Fla. Ct. App. 2015), a wife who was being admitted to a nursing home told the admissions director that "she wanted her husband to handle (review and sign) the documents," which included an arbitration clause. *Id.* at 495. Under those facts, the court held that the wife should be required to arbitrate her claims against the nursing home, even though she hadn't personally signed the arbitration agreement, because her husband was acting as her authorized agent when he signed it. *Id.* at 498. The same scenario isn't present here—there is no claim that Canady actually bought the truck and simply authorized her husband to sign the paperwork on her behalf.