1    **WO**

2

3

4

5

6                    **IN THE UNITED STATES DISTRICT COURT**

7                       **FOR THE DISTRICT OF ARIZONA**

8

9    Tonya Canady,                          No. CV-19-04738-PHX-DWL

10              Plaintiff,                   **ORDER**

11   v.

12   Bridgecrest Acceptance Corporation,

13              Defendant.

14

15         Pending before the Court are two related motions filed by Plaintiff Tonya Canady

16   ("Plaintiff"): (1) a motion to compel ESI search in response to Interrogatory No. 2 and RFP

17   Nos. 3, 4, and 7 (Doc. 128); and (2) a motion for extension of class discovery deadlines

18   (Doc. 118).  Defendant Bridgecrest Acceptance Corporation ("Bridgecrest") opposes both

19   motions.  (Docs. 123, 142.)  For the following reasons, both motions are granted.

20                         **RELEVANT BACKGROUND**

21         Plaintiff's core allegation in this case is that Bridgecrest violated the Telephone

22   Communications Protection Act, 47 U.S.C. § 227 *et seq.* ("TCPA"), by placing calls to her

23   cell phone throughout 2018 and 2019 without her consent while using an artificial or

24   automated voice.  (Doc. 1.)[1]  The complaint is styled as a "Class Action Complaint" and

25   alleges that Plaintiff is pursuing claims "individually and on behalf of all others similarly

26   situated."  (*Id.* at 1-2.)  To that end, in the "Class Allegations" section of the complaint,

27   ─────────────────────

28   [1]       The complaint also alleges that Bridgecrest violated the TCPA by using an
     automatic telephone dialing system when making the challenged calls (Doc. 1 ¶ 37), but
     Plaintiff has since clarified that she will not be pursuing that allegation (Doc. 83).

Plaintiff alleges that she is bringing claims on behalf of a "Pre-recorded Class," which "consists of: (1) All persons in the United States (2) subscribing to a cellular telephone number (3) to which Bridgecrest placed a non-emergency telephone call (4) using a pre-recorded message (5) within 4 years of the date this complaint is filed (6) after receiving a request to no longer call that number." (*Id.* ¶ 24.) The complaint also includes allegations concerning why "[t]here are questions of law and fact common to the members of the Class [that] predominate over any questions that affect only individual class members" (*id.* ¶ 31); allegations concerning why Plaintiff is a proper class representative (*id.* ¶ 32); and allegations concerning Plaintiff's counsel's experience in handling class actions (*id.* ¶ 33).

On August 24, 2021, the Court issued the scheduling order. (Doc. 61.) It authorized a bifurcated discovery schedule under which Plaintiff could first pursue "precertification discovery" and then file a motion for class certification, with merits discovery deferred until after the certification decision. (*Id.* at 2.) With respect to discovery disputes, the scheduling order provided: "The parties shall not file written discovery motions without leave of the Court. Except during a deposition, if a discovery dispute arises and cannot be resolved despite sincere efforts to resolve the matter through personal consultation (in person or by telephone), the parties shall jointly file (1) a brief written summary of the dispute, not to exceed three pages per side, explaining the position taken by each party, and (2) a joint written certification that counsel or the parties have attempted to resolve the matter through personal consultation and sincere efforts as required by Local Rule of Civil Procedure 7.2(j) and have reached an impasse." (*Id.* at 5.) Additionally, the scheduling order provided that "[a]bsent extraordinary circumstances, the Court will not entertain fact discovery disputes after the deadline for completion of fact discovery and will not entertain expert discovery disputes after the deadline for completion of expert discovery. Delay in presenting discovery disputes for resolution is not a basis for extending discovery deadlines." (*Id.* at 5-6.)

On August 30, 2021, as part of her effort to pursue class discovery in anticipation of filing of motion for class certification, Plaintiff propounded her first set of

interrogatories and requests for production ("RFPs") to Bridgecrest.  (Doc. 128-1.)  As relevant here, Interrogatory No. 2 sought to compel Bridgecrest to:

> Identify each cellular telephone number (and any associated name, address, or account number) to which you placed a non-emergency telephone call using an artificial or prerecorded voice from July 3, 2015 to the present after Bridgecrest had received a request to cease calling that number. Please include the date of each call and the telephone number dialed. If you contend that a response to this interrogatory is impossible, please explain why with specificity, and provide the most complete response possible, including the total number of unique cellular telephone numbers called. Also, if you do not know and cannot determine which calls were made to cellular telephone numbers, answer this interrogatory as if the word "cellular" was omitted from it, and Plaintiff will determine which calls were made to cellular telephones.

(*Id.* at 5.)

> Interrogatory No. 6 sought to compel Bridgecrest to:

> Identify, by vendor, version and dates in operation, all database [sic] in which Bridgecrest has stored data regarding stop, do-not-call, do-not contact, and similar notifications.  For each database, provide the data dictionary, identify each table that contains call data or information about a stop, do-no-call [sic], do-not-contact or similar notification, identify and define all codes and fields in each such table, and define the nature of the data in each field (e.g., phone number called, date called, call duration, etc.).

(Doc. 89-1 at 15.)

RFP No. 3 sought to compel Bridgecrest to produce "[t]he complete database tables showing any calls responsive to Interrogatory Nos. 2-3 above, or all other records of such calls."  (Doc. 128-1 at 7.)

RFP No. 4 sought to compel Bridgecrest to produce "[r]ecordings of all calls Bridgecrest made between July 3, 2015 and the present, in which the person who answered the phone asked that they not be called or contacted (or similar), as well as all records pertaining to calls made to those same telephone numbers or person after the date of the recording."  (*Id.*)

Finally, RFP No. 7 sought to compel Bridgecrest to produce "[a]ll documents that identify the persons responsive to Interrogatory Nos. 2-3."  (*Id.*)

Bridgecrest has made clear throughout these proceedings that it believes Plaintiff will never be able to obtain class certification because this is a revocation-of-consent case. (*See, e.g.*, Doc. 111 at 2 ["Plaintiff seeks to certify a class of individuals who allegedly

- 3 -

revoked their consent to be called. Yet, as this case makes obvious, revocation of consent cases are rarely certifiable because revocation of consent is an individual, fact-intensive issue that is not appropriate for class treatment."].)  To that end, Bridgecrest filed a motion in September 2021 to strike Plaintiff's class allegations.  (Doc. 65.)  Additionally, when it came time to respond to Plaintiff's interrogatories and RFPs in October 2021, Bridgecrest objected on the ground that Interrogatory No. 2 and RFP No. 7 "seek[] information regarding customers who could never be part of Plaintiff's putative class."  (Doc. 89-1 at 6; Doc. 90-1 at 22).  Additionally, Bridgecrest argued these discovery requests were unduly burdensome because, to comply,

> Bridgecrest would arguably be required to (1) identify every call it made during the last six-and-a-half years using an artificial voicemail, (2) determine which of those calls were made to a cellular telephone, (3) listen to recordings of the calls and/or interview its employees and past employees to determine whether the calls were for emergency purposes (*e.g.*, fraud alerts), as that term is broadly understood, and (4) listen to recordings and/or interview its employees and past employees regarding the content of every call made prior to a non-emergency artificial voicemail to determine if the customer had ever requested that Bridgecrest "cease calling that number" or later re-consented to receiving calls.  That process could take tens of thousands of hours, or more.

(Doc. 89-1 at 5; Doc. 90-1 at 21.)

On January 26, 2022, the parties filed joint notices informing the Court of discovery disputes concerning, *inter alia*, Interrogatory Nos. 2 and 6 and RFP Nos. 3, 4, and 7.  (Docs. 89, 90.)

On January 31, 2022, the Court issued an order denying Bridgecrest's motion to strike Plaintiff's class allegations.  (Doc. 91.)  Among other things, the Court explained that "Bridgecrest's essential argument is that [Plaintiff's] class allegations should be stricken because, when it comes time to formally take up the issue of certification under Rule 23, [Plaintiff] won't be able to meet her burden 'because individual questions of revocation predominate, putative class members lack commonality, and Plaintiff is not representative of the class,'" but because "[t]hese are the same issues that will be decided when determining whether to grant class certification, . . . Bridgecrest's reliance on Rule 12(f) is misplaced."  (*Id.* at 5.)

On February 10, 2022, the Court heard oral argument regarding the parties' discovery disputes. The Court did not resolve the parties' disputes concerning Interrogatory No. 2 and RFP Nos. 3, 4, and 7 because it did not appear that the parties had adequately met and conferred about them. (Doc. 94.) As for Interrogatory No. 6, which called for Bridgecrest to produce the "data dictionaries" for the databases in which it stored do-not-call information, the Court ordered Bridgecrest to comply. (*Id.*) The Court explained that it was hopeful such "data dictionary" information would be useful to the parties in crafting search terms that could be used when "attempt[ing] to obtain discovery in pursuit of class certification" and ordered the parties to meet and confer with respect to search terms once Bridgecrest's production in response to Interrogatory No. 6 was complete. (*Id.*) Finally, and relevant here, the Court clarified that "[i]f disputes remain after counsel have complied with this Court's order . . . counsel may file a formal Motion to Compel." (*Id.*)

On March 15, 2022, Plaintiff filed a "motion to enforce." (Doc. 101.) In a nutshell, Plaintiff argued that Bridgecrest had not yet produced the data dictionary information it had been ordered to produce on February 10, 2022. (*Id.*)

On March 22, 2022, the Court heard oral argument. (Doc. 105 [minute entry]; Doc. 130 [transcript].) On the one hand, the Court faulted Plaintiff for bringing the dispute to the Court's attention via a unilaterally filed motion instead of via the joint-notice procedure set forth in the scheduling order. (Doc. 130 at 9.) On the other hand, the Court disapproved of Bridgecrest's failure to timely produce the data dictionary information:

> Everybody seemed to be crystal clear at that [February 10] hearing . . . that Bridgecrest could comply with pretty quickly, and once that got done that would pave the way for hopefully resolving a lot of the parties' other discovery disputes that this was sort of a bottleneck for. So I will say that I was surprised when I saw [Plaintiff's motion] come in, and I saw that a month and change after we had this hearing where it seemed like Bridgecrest expressed no concerns whatsoever about producing the data dictionaries . . . you then see this chain of correspondence between the two sides [where] Plaintiff is just repeatedly asking for updates and they're just sort of getting the runaround until they're finally forced to file something, and then only after they file something you belatedly comply with the discovery request . . . on the very day you file your response and then act [like] the whole thing is moot. . . . I'm not thrilled by it because this is not at all what I was expecting when I concluded the last discovery dispute hearing.

(*Id.* at 9-10.)  Ultimately, the Court issued a renewed order for Bridgecrest to comply with Interrogatory No. 6, set a compliance deadline of March 29, 2022, and clarified that "[i]f [Plaintiff] remains dissatisfied with the response that they get by March 29th, . . . the next time around I do want the parties to follow my dispute discovery process rather than filing motions."  (*Id.* at 14.)

On March 29, 2022, Bridgecrest served a supplemental response to Interrogatory No. 6.  (Doc. 108-2.)  Upon receipt, Plaintiff asserted that the response remained incomplete.  (Doc. 108 ¶¶ 4-5.)  It appears that, in lieu of seeking intervention from the Court, Bridgecrest agreed to resolve this dispute by producing more information.  (*Id.*)

On April 15, 2022, Bridgecrest served another supplemental response to Interrogatory No. 6.  (Doc. 108 ¶ 5 & n.1; Doc.127-1 [under seal].)  "This supplemental response contained 340 data fields spread across nine database tables, and more than 5,000 rows of data."  (Doc. 108 ¶ 5.)

On May 9, 2022, after analyzing Bridgecrest's production of April 15, 2022 and conferring with a consultant, Plaintiff "asked Bridgecrest to produce some additional records needed to craft the appropriate ESI search terms—*i.e.*, each record referencing her cellphone number, as well as her husband's, that were stored in the database tables identified in the response to Interrogatory No. 6."  (*Id.* ¶ 6.  *See also* Doc. 108-3 at 6.)

On May 13, 2022, after not receiving a response, Plaintiff sent a follow-up inquiry to Bridgecrest.  (Doc. 108-3 at 5.)

On May 17, 2022, after again not receiving a response, Plaintiff sent another follow-up inquiry to Bridgecrest.  (*Id.*)  That same day, Bridgecrest responded by stating, *inter alia*, that "we hope we'll be able to get you any supplemental information on that soon."  (*Id.* at 4.)

On May 20, 2022, Plaintiff received a production from Bridgecrest.  (*Id.* at 3.)

On May 23, 2022, Plaintiff sent a follow-up email noting that certain call recordings remained missing, requesting dates for certain undated recordings, and inquiring "as to the

status of the records referencing Plaintiff's and Mr. Canady's numbers in each database table identified in Interrogatory No. 6." (*Id.*)

On May 25, 2022, after not receiving a response, Plaintiff sent the following follow-up inquiry: "Following up again.  Please advise." (*Id.* at 2.)

On May 26, 2022, after again not receiving a response, Plaintiff sent an email that again inquired as to the status of the records referencing Plaintiff's and Mr. Canady's numbers, noted that it was a time-sensitive issue, and requested a response "ASAP." (*Id.*)

On May 27, 2022, Bridgecrest provided a supplemental production.  (Doc. 108 ¶ 7; Doc. 128-4 at 8.)  That same day, Plaintiff sent a response email suggesting that the supplemental production might be incomplete and asking Bridgecrest to "confirm that there are no records related to Plaintiff stored in the remaining ten tables." (Doc. 128-4 at 8.)

Also on May 27, 2022, Plaintiff filed a motion for an extension of the deadline to complete class discovery.  (Doc. 108.)  Plaintiff argued that Bridgecrest's production of May 27, 2022 remained deficient and that more time was needed:

> Plaintiff is still conferring with Bridgecrest regarding the remaining records needed to craft the ESI search terms, and Plaintiff hopes to resolve the issue by agreement.  However, given that it took 64 days for Bridgecrest to provide a full response to Interrogatory No. 6, and nearly three weeks to produce a narrow set of records related to Plaintiff, the Parties cannot complete the ESI search by the June 9, 2022 class discovery deadline.

(*Id.* ¶ 8.)

Bridgecrest filed an opposition to the extension request, arguing that any class discovery should be disallowed because "individual issues about who has authority to revoke consent, whether consent was revoked, and the scope of any revocation make 'revocation' cases inappropriate for class treatment."  (Doc. 111 at 3.)  Additionally, Bridgecrest argued that Plaintiff had been "relentlessly seeking overbroad class discovery" but had not been diligent in scheduling Bridgecrest's deposition.  (*Id.* at 3, 7-8.)

On June 9, 2022, the Court heard oral argument on Plaintiff's extension request.  (Doc. 115 [minute entry]; Doc. 139 [transcript].)  Acknowledging that "it's a close call," the Court concluded that the extension request should be granted because Plaintiff had

"been diligent."  (Doc. 139 at 28.)  The Court elaborated:

> [T]he thrust of what was going on [during the earlier discovery dispute hearings] is there was agreement that the plaintiffs need to be able to craft keywords to run a search through Bridgecrest's database, because that would be the key to unlocking the rest of the class discovery process.  And so we've already had a lot of proceedings in this case about trying to get in a position so that they could run the search . . . that they need to run to do what they need to do for discovery purposes. . . .  [I]t does appear to me that the plaintiffs have been diligent in attempting to finalize the ESI keyword search that they need to do, and that we've all been focusing on for the last couple of months. . . .  [Although] it is not entirely clear to me why the plaintiffs would have been unable to come up with a keyword search on March 29th or April 15th when they got the big initial production and then a substantial supplemental production of dictionary definitions and all the sorts of things that we were talking about in February, and why they needed to continue asking for additional information after April 15th in order to run the keyword searches[,] . . . I [accept Plaintiff's counsel's explanation] that the additional data [Plaintiff] requested . . . would give a better foundation for understanding the database and understanding how to run . . . better calibrated keyword searches.

(*Id.* at 28-29.)  Thus, the Court extended the deadline for the completion of class discovery to August 9, 2022 and extended the deadline for the filing of a class certification motion to January 30, 2023.  (Doc. 115.)

On June 10, 2022, Plaintiff sent a follow-up email to Bridgecrest concerning Plaintiff's email of May 27, 2022, which (as noted above) sought confirmation that Bridgecrest's supplemental production of May 27, 2022 was complete: "Following up.  Please advise."  (Doc. 128-4 at 7.)

On June 16, 2022, after not receiving a response, Plaintiff sent another follow-up email: "Third follow-up.  Please advise."  (*Id.*)

That same day, Bridgecrest responded by characterizing Plaintiff's emails as "self-serving nonsense" and stating that Bridgecrest believed its earlier production was complete.  (*Id.* at 6-7.)

That same day, Plaintiff responded by identifying reasons the May 27, 2022 production may be incomplete and again asking for a confirmation of completeness.  (*Id.* at 6.)  Bridgecrest's response was short and dismissive.  (*Id.* at 5-6.)

On June 17, 2022, Plaintiff elaborated on her request for confirmation.  (*Id.* at 4-5.)

On June 21, 2022, Bridgecrest responded that "we have no reason to believe there

is additional information, and you obviously do not either. . . .  [I]f we discover any information was missing we will supplement our response accordingly.  We [have] absolutely no reason to believe, however, we'll have anything to supplement." (*Id.* at 4.)

On June 27, 2022, Plaintiff proposed, for the first time, the search terms for the proposed search.  (Doc. 128-5 at 5.)  Specifically, Plaintiff proposed that Bridgecrest conduct the following two searches:

1.    Provide all account notes, call records/logs, and call recordings for each phone number Bridgecrest called after the corresponding account notes reflect an entry captured through the following natural language search: DNC or "do-not-call" or "do not call" or ("do not" or stop! or quit! or "don't" "should not" or "shouldn't" or cease /5 call! or contact!).

2.    Provide all account notes, call records/logs, and call recordings for each phone number Bridgecrest called after it was listed in the table DNCPhone with: (1) the field "isactiveDNC" coded as "true;" and (2) the field DNCRemoveReasonID coded as "null."

(*Id.*)

On July 5, 2022, the parties held a conference call to discuss Plaintiff's proposal. According to a summary email drafted by Plaintiff's counsel following the call, Bridgecrest's counsel stated during the call that he had "forwarded [Plaintiff's] proposed terms to Bridgecrest, and expect[ed] to have Bridgecrest's position on what it [would] take to conduct the search within the next day or so." (Doc. 128-6 at 7.)  However, Bridgecrest's counsel disputed this characterization: "I did not say I would know within a day or so what it will take to conduct the search.  In fact, I pointed out the opposite—that, as we have previously advised on numerous occasions, I do not think such a search is possible.  But I will discuss with my client and get back to you." (*Id.* at 6.)

On July 8, 2022, Plaintiff sent a follow-up email: "[I]s there any word on the ESI search?" (*Id.* at 5-6.)

On July 11, 2022, Plaintiff sent another follow-up email: "Following up on the below.  What did your client say about the proposed ESI search.  [sic]  Please advise. Thanks." (*Id.* at 5.)  That evening, Bridgecrest responded: "We are still investigating and

hope to have a response to you by the end of the week." (*Id.* at 4-5.)

On July 12, 2022, Plaintiff wrote a response email:

> Is there a particular concern your client has or are you still waiting to hear from them? We are burning a lot of time just to get confirmation whether your client has any issues to even try running the searches. Once again, if there is an issue, I suggest we have ESI liaisons discuss directly to resolve an issues [sic] in short order instead of the attorneys going back and forth.

(*Id.* at 4.)

On July 14, 2022, after not receiving a response, Plaintiff sent a follow-up email: "Following up on the below. Please advise." (*Id.* at 3.) That same day, Bridgecrest sent a response that provided in part as follows: "[W]e hope to have a response to you by the end of the week (and it may be early next week), either of which is much quicker than the amount of time Bridgecrest would have to respond to these requests if Plaintiff had properly requested this information through a discovery request." (*Id.*)

On July 19, 2022, Bridgecrest provided a substantive response, opposing Plaintiff's request to run the two requested searches. (Doc. 128-7 at 3-5.) Bridgecrest's overarching position was that:

> Bridgecrest objects to Plaintiff's requests because, among other reasons, they are ridiculously overbroad, not reasonably calculated to lead to the discovery of admissible evidence, and the burden or expense of the requests outweighs any possible benefit. In fact, Plaintiff's requests just further prove that this case could never be certified as a class action.

(*Id.* at 3.) More specifically, Bridgecrest identified various reasons why Plaintiff's proposed searches would capture information regarding individuals who could not qualify as class members. (*Id.* at 4.) Separately, Bridgecrest asserted:

> From a logistics aspect, Bridgecrest also has no automated method to tie hits on Plaintiff's requested keyword search to specific subsequent phone numbers later dialed, as the phone number associated with a specific account note is not separately logged in the account note system. Thus, even if the account notes reflected that the customer did not want Bridgecrest to call a particular number, a keyword search would not be able to determine whether a call was subsequently made to that number. Complying with Plaintiff's request would thus require Bridgecrest to individually review each account note, call log, and recording for any accounts that had a search hit (even though the search hits are not limited to possible class members) . . . Nor could any purported benefit of searching for and reviewing such voluminous records outweigh the prohibitive cost, particularly where almost all individuals associated with the search cannot be part of Plaintiff's putative class.

(*Id.*)  Bridgecrest made clear that these objections applied to both of the proposed searches. (*Id.* at 5.)

That same day, Plaintiff sent the following response: "Since you are objecting the expense outweighs the benefit, what is the cost to run the searches?  Along that line, we can have our database expert conduct the searches at no [cost] to Defendant."  (*Id.* at 3.)

On July 26, 2022, Bridgecrest sent a response.  (*Id.* at 2.)  Bridgecrest did not attempt to quantify the cost of running the searches, as had been requested, but argued that allowing Plaintiff's expert to run the searches was not a feasible solution because the proposed searches would generate information "that is not relevant to this matter" and "[s]uch information is not discoverable regardless of cost or expense."  (*Id.*)  Alternatively, Bridgecrest argued:

> The costs associated with Plaintiff's requests are prohibitive regardless of whether you or Plaintiff "run the searches."  For example, even if limited just to Plaintiff's first request, for the reasons set forth in our previous correspondence a result-by-result review would be necessary to determine, among other things, whether a DNC request was actually made, whether the number associated with the keyword search hit was subsequently called, if the person that made the DNC is subject to an arbitration agreement, whether the person who made the DNC request or someone else with sufficient authority re-consented, the type of phone at issue, the type of call at issue, and if the called party's jurisdiction even permits bargained-for-consent to be revoked.

(*Id.*)

It appears the parties stopped meeting and conferring about the search terms after Bridgecrest sent its July 26, 2022 email.  The next relevant event occurred on July 28, 2022, when Plaintiff conducted a Rule 30(b)(6) deposition of Bridgecrest.  Although the transcript of this deposition does not appear to be available, Plaintiff's counsel avows in a declaration that "[d]uring the deposition, [Bridgecrest's 30(b)(6) representative] estimated it would take roughly two hours to generate a list of each phone number Bridgecrest placed on its internal DNC list at the recipient's request along with the corresponding date and time, while excluding any instances in which a phone number on the internal DNC list had subsequently been removed.  [The representative also] testified the time required to

generate the list would remain the same regardless of how many phone numbers were identified in the search."  (Doc. 128-9 ¶¶ 3-4.)

On August 5, 2022—that is, four days before the August 9, 2022 deadline for the completion of class discovery (Doc. 115)—Plaintiff lodged a sealed version of the first motion now pending before the Court, which is a motion to compel Bridgecrest to comply with Interrogatory No. 2 and RFP Nos. 3, 4, and 7.  (Docs. 116, 117.)  A redacted version of the motion was eventually filed on the public docket on August 22, 2022.  (Doc. 128.)  The motion is now fully briefed.  (Doc. 142 [response]; Doc. 158 [reply].)

On August 9, 2022, Plaintiff filed the other motion now pending before the Court, which is a motion to extend class discovery deadlines.  (Doc. 118.)  The motion is now fully briefed.  (Doc. 123 [response]; Doc. 136 [reply].)

Neither side requested oral argument on either motion.

## DISCUSSION

I.   <u>Motion To Compel</u>

A.   **Legal Standard**

Rule 37(a)(3)(B) of the Federal Rules of Civil Procedure provides that "[a] party seeking discovery may move for an order compelling an answer, designation, production, or inspection" when the non-moving party "fails to answer an interrogatory submitted under Rule 33" or "fails to produce documents . . . as requested under Rule 34."

Rule 26(b), in turn, defines the "Scope and Limits" of discovery.  Under Rule 26(b)(1), "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit."[2]  Under Rule 26(b)(1), "[i]nformation . . . need not

---

[2]      The current version of Rule 26(b)(1) was enacted in 2015.  An earlier version provided that the requested material had to be "relevant to the subject matter involved in the pending action," and the Ninth Circuit has recognized that the change in 2015 (under which "the 'subject matter' reference [was] eliminated from the rule, and the matter sought

be admissible in evidence to be discoverable."

As for the burden of proof, "the party seeking to compel discovery has the initial burden of establishing that its request satisfies the relevancy requirements of Rule 26(b)." *Doe v. Swift Transp. Co.*, 2015 WL 4307800, *1 (D. Ariz. 2015).  This "is a relatively low bar." *Continental Circuits LLC v. Intel Corp.*, 435 F. Supp. 3d 1014, 1018 (D. Ariz. 2020). *See generally* 1 Gensler, Federal Rules of Civil Procedure, Rules and Commentary, Rule 26, at 801-02 (2021) ("For discovery purposes, courts define relevance broadly, stating that information is relevant if it bears on or might reasonably lead to information that bears on any material fact or issue in the action. . . .  [C]ourts are quick to point out that discovery is concerned with relevant information—not relevant evidence—and that as a result the scope of relevance for discovery purposes is necessarily broader than trial relevance.") (footnotes and internal quotation marks omitted).  If the movant meets its burden of establishing relevancy, "the party opposing discovery has the burden to demonstrate that discovery should not be allowed due to burden or cost and must explain and support its objections with competent evidence." *Doe*, 2015 WL 4307800 at *1.

Finally, LRCiv 7.2(j), entitled "Discovery Motions," provides that "[n]o discovery motion will be considered or decided unless a statement of moving counsel is attached thereto certifying that after personal consultation and sincere efforts to do so, counsel have been unable to satisfactorily resolve the matter.  Any discovery motion brought before the Court without prior personal consultation with the other party and a sincere effort to resolve the matter, may result in sanctions."

…

…

---

must [now] be 'relevant to any party's claim or defense'") "was intended to restrict, not broaden, the scope of discovery." *In re Williams-Sonoma, Inc.*, 947 F.3d 535, 539 (9th Cir. 2020).  *See also* Fed. R. Civ. P. 26, advisory committee's note to 2015 amendment (noting that Rule 26(b)(1) was amended in 1983 in part "to encourage judges to be more aggressive in identifying and discouraging discovery overuse," that the "clear focus of the 1983 provisions may have been softened, although inadvertently, by [subsequent] amendments," and that the 2015 amendment was intended in part to "restore[] the proportionality factors to their original place in defining the scope of discovery").

B.     **The Parties' Arguments**

Plaintiff moves to compel Bridgecrest to run the two searches outlined Plaintiff's email of June 27, 2022, which are intended to generate information responsive to Plaintiff's Interrogatory No. 2 and RFP Nos. 3, 4, and 7.  (Doc. 128.)  Plaintiff argues the requested information is relevant because "[t]he point of the search was to obtain: (1) the information sought in Interrogatory No. 2—*i.e.*, identification of each cellphone number Bridgecrest called for non-emergency purposes using a prerecorded message after receiving a stop call requests [sic] along with the dates of each call and any associated information regarding the recipient; and (2) the corresponding call logs, recordings, and account notes reflecting those calls, which fall within the scope of RFP No. 3, 4, and 7."  (*Id.*)  According to Plaintiff, such "information is aimed directly at identifying the members of the proposed class, which is plainly relevant to certification."  (*Id.* at 9-10.)  As for Bridgecrest's contention that "nothing obtained through the proposed search terms would be relevant to certification," Plaintiff contends this objection is not only inaccurate but premature, as "[w]hether those putative class members . . . should be excluded from the class is an issue for the Court to resolve at class certification."  (*Id.* at 10-13.)

As for Bridgecrest's contention that the search is technologically infeasible, Plaintiff contends that "the call records use a specific code that makes identifying the pre-recorded message a simple task that can be performed in a matter of minutes" and "Plaintiff's expert can identify which phone numbers are assigned to cellphone numbers by cross referencing the numbers called with historical cellular databases."  (*Id.* at 13.)  As for Bridgecrest's concerns over the sensitive and confidential nature of the requested information, Plaintiff contends that such concerns are unfounded in light of the existence of the agreed-to protective order in this case.  (*Id.* at 13-14.)  And as for Bridgecrest's concerns "about the need to conduct an 'individualized inquiry' to identify the regular user or subscriber for each cellphone number at issue, and instances of 'invalid revocation,'" Plaintiff contends that these "are legal arguments that go to the propriety of class certification, which have no bearing on the permissible scope of discovery."  (*Id.* at 14.)

Turning to the question of undue burden, Plaintiff argues that Bridgecrest has failed to meet its burden because it "has not provided a single affidavit (or any other evidence[]) to back up its burden objection," and "[i]n fact, when Plaintiff asked for details about the costs involved in running the search, Bridgecrest deflected by stating the class discovery at issue was 'not discoverable regardless of costs or expense,' and there was no point trying to perform the search because the proposed class could never be certified."  (*Id.* at 15.)  Plaintiff argues that "extracting data from computer databases is standard fare in TCPA class actions, which is precisely why courts routinely reject the notion that doing so constitutes an 'undue burden.'"  (*Id.*)  According to Plaintiff, "[e]ven assuming the corresponding account notes, call logs, recordings, and documents identifying the recipients are housed in [multiple] databases, the fact that Bridgecrest may need to extract and combine data from multiple sources does not rise to the level of an undue burden, particularly when there is no indication Bridgecrest cannot [create] a program to streamline the process."  (*Id.* at 16.)  Finally, Plaintiff argues that she "has mooted any purported undue burden and expense by offering to have her expert perform the work so long as Bridgecrest provides access to its systems."  (*Id.* at 16-17.)

Bridgecrest opposes Plaintiff's motion for a host of procedural and substantive reasons.  (Doc. 142.)  As for the procedural reasons, Bridgecrest first argues the motion is untimely because it was filed on the eve of the deadline for completing class discovery.  (*Id.* at 5-6.)  In a related vein, Bridgecrest contends that Plaintiff was not diligent in proposing the search terms that give rise to the current dispute because she "could have proposed [the] searches months ago" and "waited yet another month" after receiving Bridgecrest's supplemental production of May 27, 2022.  (*Id.* at 6.)  Next, Bridgecrest argues that Plaintiff violated LRCiv 7.2(j) by failing to meet and confer in good faith before filing the motion.  (*Id.* at 6-7.)  According to Bridgecrest, Plaintiff did not meaningfully respond to the concerns that Bridgecrest raised in its emails of July 19 and 26, 2022, other than to write a two-sentence response to the first email.  (*Id.*)  Finally, Bridgecrest argues the motion is also procedurally improper because it violates the provision in the scheduling

order requiring discovery disputes to be presented by way of a joint summary.  (*Id.* at 7-8.)

Turning to its substantive concerns, Bridgecrest objects to Plaintiff's first request—*i.e.,* for Bridgecrest to conduct a "natural language search" of the "account notes" for the term "do not call," or variations thereof, and then produce "all account notes, call records/logs, and call recordings for each phone number Bridgecrest called" after having received one of these "do not call" variations (Doc. 142-1 ¶ 3 )—for two reasons: (1) the request is overbroad and not reasonably likely to lead to a certifiable class because, *inter alia,* "virtually all of Bridgecrest's customers are subject to arbitration agreements, and thus cannot be part of Plaintiff's putative class" (Doc. 142 at 11); and (2) the request would result in an undue burden because "there is not a way to systematically perform the requested search across all account notes and subsequent calls."  (*Id.* at 9.)  Expounding on the latter, Bridgecrest asserts that Plaintiff has not "identified any such search methodology, despite the extensive data in her possession regarding Bridgecrest's system," and "[e]ven if the search could be systematically performed, it would still require an account-by-account review because of the extensive amount of mishits that would be returned by Plaintiff's overbroad search."  (*Id.*)  According to Bridgecrest:

> Assuming it would only take an employee five minutes (and that is an unrealistically low estimate) to review each search hit, such a review would take thousands of hours (despite that discovery on class certification is already over) to determine if such numbers were subsequently called and evaluate whether a subsequent call was permissible because the individual re-consented, the original revocation was partial, or some other reason.

(*Id.* at 10.)

As for Plaintiff's second request—*i.e.*, for Bridgecrest to identify the subset of records listed in the "table DNCPhone" where the field "isactiveDNC" coded as "true" and the field DNCRemoveReasonID coded as "null" and then produce "all account notes, call records/logs, and call recordings for each phone number Bridgecrest called" despite having been listed in the table (Doc. 142-1 ¶ 8.)—Bridgecrest raises the same objections of overbreadth/irrelevance and undue burden.  (Doc. 142 at 11-15.)  Bridgecrest concludes by reiterating why it believes that, regardless of whether the proposed searches are conducted,

Plaintiff will never be able to certify a class due to the predominance of individualized issues.  (*Id.* at 15-17.)

In reply, Plaintiff first argues that her motion is not procedurally improper because the Court expressly authorized, following the February 2022 discovery hearing, the filing of a motion to compel (in lieu of a joint summary) as to any future dispute related to keyword searches.  (Doc. 158 at 2.)  Next, Plaintiff argues there was no violation of the meet-and-confer requirement because she made good-faith efforts to confer with Bridgecrest's counsel following the search proposal, only for Bridgecrest's counsel to ignore follow-up requests, fail to quantify the cost of the search, and fail to respond in good faith to her offer to have her expert conduct the searches.  (*Id.*)  Next, Plaintiff argues  that her motion is not untimely because it was filed before the close of the relevant discovery period, "Plaintiff took every possible measure to meet and confer with Bridgecrest about the proposed ESI search before filing this Motion, only to be met with resistance each step of the way," and "Bridgecrest only recently revealed an entirely separate database that can be systematically searched to identify every prerecorded call placed to a particular number during within a specified date range, which could have streamlined the process of carrying out the search months ago."  (*Id.* at 2-4.)  Next, Plaintiff argues that courts routinely allow class discovery before deciding the question of certification.  (*Id.* at 4-5.)  Next, Plaintiff argues that Bridgecrest's undue burden arguments are unavailing because Bridgecrest's Rule 30(b)(6) representative conceded that "there is a way to 'systematically' perform the Keyword Searches across all account notes and subsequent calls" and, "[t]hus, performing the Keyword Search should be a straightforward issue of querying the database storing the account notes to identify DNC requests, followed by a separate search of the ATDS database to identify any subsequent prerecorded calls placed to those numbers, and then comparing the results."  (*Id.* at 6.)  Plaintiff cites cases in support of the proposition that "the task of matching the data obtained from two different databases is commonplace in modern litigation."  (*Id.*)  Plaintiff also identifies other TCPA cases in which similar keyword searches were performed with little burden.  (*Id.* at 6-8.)  Plaintiff reiterates that

even "[a]ssuming Bridgecrest could show running either ESI search would impose an undue burden, Plaintiff mooted any objections on that point by offering to have her expert do so." (*Id.* at 8-9.) Finally, Plaintiff argues that all of Bridgecrest's overbreadth objections "are just legal defenses to class certification, which have no bearing on this discovery dispute." (*Id.* at 11.)

C. **Discussion**

In the Court's estimation, Bridgecrest bears much of the fault for the current state of affairs. Bridgecrest appears to believe that it shouldn't be required to engage in any class-related discovery in this case, because Plaintiff's certification request will inevitably be denied, and that Plaintiff's discovery-related requests are nothing more than a nuisance intended to drive up costs and extract an unwarranted settlement. (Doc. 111 at 3 ["These type of individual issues about who has authority to revoke consent, whether consent was revoked, and the scope of any revocation make 'revocation' cases inappropriate for class treatment. Despite this, Plaintiff's counsel has been relentlessly seeking overbroad class discovery to try to gain leverage in this case."].)

The difficulty with this position is that Bridgecrest agreed at the outset of the case to bifurcate the discovery process into two parts, with the first part encompassing class-related discovery. (Doc. 58 at 9 [Rule 26(f) report: "[T]o ensure that any discovery is as efficient and economical as possible, Bridgecrest intends to file a motion to bifurcate class discovery from merits discovery."]; *id.* at 14 ["The Parties believe a seventh-month pre-certification fact-discovery period is appropriate . . . ."].) Additionally, the Court made clear when denying Bridgecrest's motion to strike that it would be premature to decide the merits of the certification issue until the certification stage of the case (which, as noted, Bridgecrest had previously agreed would occur *after* precertification discovery). (Doc. 91.) Thus, Bridgecrest should have—and, indeed, was required to—participate in good faith in the precertification discovery process, including meeting and conferring in good faith with Plaintiff's counsel over Plaintiff's class-related discovery requests.

The Court emphasized this point during the February 10, 2022 discovery dispute

hearing.  Not only did the Court order Bridgecrest to produce additional information in response to Interrogatory No. 6 (which sought information about Bridgecrest's data dictionaries) so that Plaintiff could formulate better keyword searches, but the Court also specifically ordered the parties "to meet and confer regarding Plaintiff's attempts to obtain discovery in pursuing class certification" once the additional information was produced. (Doc. 94.)  Despite this directive, it does not appear that Bridgecrest has cooperatively participated in Plaintiff's subsequent efforts to pursue class discovery via keyword searches.  During the March 22, 2022 hearing (which was necessitated by Bridgecrest's failure to promptly comply with the February 10, 2022 production order), the Court observed that Plaintiff's counsel was "repeatedly asking for updates and they're just sort of getting the runaround until they're finally forced to file something."  (Doc. 130 at 9-10.)

The parties' subsequent email correspondence indicates that not much has changed since that observation.  As noted in the Background section of this order, above, there have been multiple episodes since March 2022 in which Plaintiff's counsel sought information about a certain search-related topic, only to have to reply-all to his own email one or more times due to a lack of response from Bridgecrest.  Moreover, it does not appear that Bridgecrest has ever attempted to find a way to narrow Plaintiff's requests in a way that might address Bridgecrest's concerns over overbreadth and burden—instead, Bridgecrest has simply pointed out perceived flaws in Plaintiff's proposals and reiterated its belief that any class discovery would be a waste of time.  This is not, in general, the way the discovery process is supposed to work, and it was certainly not the way the discovery process was supposed to work in this case, where the Court made clear that Plaintiff was entitled to engage in class-related discovery and specifically ordered Bridgecrest to meet and confer with Plaintiff in an attempt to craft appropriate search terms.

Given this backdrop, the Court has little trouble rejecting many of Bridgecrest's arguments as to why the motion to compel should be denied.  Procedurally, the motion was timely (because Plaintiff filed it before the close of discovery and less than two weeks after the dispute came to a head) and was filed in a permissible form (because the Court stated

during the February 22, 2022 discovery hearing that Plaintiff could file a motion to compel, rather than a joint summary, if any future disputes arose concerning the search terms). Substantively, Bridgecrest's overbreadth and relevance objections are unavailing. The Court has made crystal-clear that Plaintiff should be allowed to pursue *some* class discovery, and it is also clear at least *some* of the information that would be produced in response to the two searches Plaintiff proposed on June 27, 2022 would be relevant to the certification inquiry. Even if the proposed search parameters are overbroad, and thus will result in the production of certain other information that is irrelevant to the certification inquiry, Bridgecrest has made no effort to narrow the proposed search parameters. As a result, Bridgecrest cannot complain about overbreadth—instead, it must establish that running the searches proposed by Plaintiff would result in an undue burden.

Whether Plaintiff exhausted the meet-and-confer process, as required by LRCiv 7.2(j), presents a closer question. The relevant chronology is that Plaintiff proposed the two searches on June 27, 2022 (Doc. 128-5) and, after some back and forth, Bridgecrest sent a detailed response on July 19, 2022 (Doc. 128-7 at 3-5). The response stated that the proposed searches were not feasible "[f]rom a logistics aspect" because Bridgecrest "has no automated method" to perform the search. (*Id.*) In response, Plaintiff asked Bridgecrest to quantify the cost of conducting a more individualized review and suggested that its expert could perform the review at no cost. (*Id.* at 3.) One week later, on July 26, 2022, Bridgecrest explained—without providing the quantification requested by Plaintiff—that allowing Plaintiff's expert to run the searches would not solve the problem because "the costs" would be "prohibitive" even if Plaintiff's expert ran the searches, due to the complexities involved. (*Id.* at 2.) Plaintiff stopped meeting and conferring with Bridgecrest about these issues after receiving the July 26, 2022 email.

The cessation of meet-and-confer activity here was unfortunate. In the Court's estimation, the crucial issue is whether Plaintiff's offer to have her expert run the searches would ameliorate the cost and undue burden objections raised by Bridgecrest. But during the meet-and-confer process, the parties never truly engaged on this point. The parties

1   talked past each other in their email exchange between July 19-26, 2022, then stopped

2   talking altogether.

3          Even though it might be possible, when looking at the July 19-26, 2022 exchange

4   in isolation, to fault Plaintiff for the lack of continued meet-and-confer efforts, this episode

5   must be viewed in the broader context of this case.  The Court's overall impression is that

6   Plaintiff has exhibited diligence in attempting to devise and hone a search methodology for

7   obtaining class discovery while Bridgecrest has not.  This pattern repeated itself during the

8   exchange of July 19-26, 2022, when Bridgecrest did not meaningfully respond to Plaintiff's

9   request for a cost estimate for Bridgecrest to run the searches or to Plaintiff's alternative

10  offer to have her expert run the searches at no cost.  Given Bridgecrest's lack of

11  responsiveness, as well as the fact that the discovery deadline was about to expire, it is

12  understandable why Plaintiff felt it necessary to seek judicial intervention in lieu of

13  continuing to meet and confer.

14         This leaves Bridgecrest's final substantive objection, which is that running the

15  proposed searches would result in an undue burden.  This argument fails for several

16  reasons.  First, the burden-related assertions in Bridgecrest's July 19, 2022 and July 26,

17  2022 emails were simply the representations of counsel, who was presumably relaying

18  technical information about Bridgecrest's records systems that he learned from others.

19  That approach may have been permissible during the meet-and-confer process, but now

20  that the dispute has reached the motion-to-compel stage, Bridgecrest bears the burden of

21  "support[ing] its [undue burden] objections with competent evidence."  *Doe*, 2015 WL

22  4307800 at *1.  Bridgecrest has not, however, submitted any evidence concerning the cost

23  of running the proposed searches.  Additionally, although Bridgecrest has submitted a

24  declaration from an individual who is familiar with Bridgecrest's database systems, who

25  avows that he is "not aware of any way to perform [the Keyword Search] on a systematic

26  basis across all account notes" (Doc. 133-1 ¶ 6), this individual's declaration is quite terse

27  and does not go into anywhere near the level of detail that was provided in counsel's July

28  19, 2022 and July 26, 2022 emails.  This is also the same individual who, according to

Plaintiff's counsel's declaration, made admissions to the contrary when acting as Bridgecrest's Rule 30(b)(6) designee on July 28, 2022.  (Doc. 128-9 ¶¶ 3-4.)  Bridgecrest does not acknowledge Plaintiff's argument on this point in its response brief.  Perhaps it is possible to reconcile the two sets of statements, but it was Bridgecrest's burden to attempt to do so.

Second, and more important, even assuming it would be unduly burdensome for *Bridgecrest* to run the proposed searches, Plaintiff has offered to have her expert run the searches at no expense to Bridgecrest.  Although Bridgecrest asserted in its email of July 26, 2022 that "the costs associated with Plaintiff's requests are prohibitive regardless of whether . . . Plaintiff 'run[s] the searches'" (Doc. 128-7 at 2), Bridgecrest has never provided a persuasive explanation of why that would be the case.  Bridgecrest argues that "having Plaintiff's expert run the search does not eliminate the significant time and expense required to cull the inordinate number of mishits that would be generated by Plaintiff's search" (Doc. 142 at 10), but if Plaintiff's expert is performing the culling, it is unclear why the cost would somehow be shifted to Bridgecrest.

Finally, to the extent Bridgecrest's position is simply that it would be unacceptable to allow an outsider to have access to its databases, the Court understands this concern but notes that (1) it is addressed, at least in part, by the protective order in place in this action, and (2) Bridgecrest's unwillingness to work cooperatively with Plaintiff during the discovery process is one reason why the option of having Plaintiff's expert conduct the search is even on the table.

For these reasons, Plaintiff's motion to compel is granted.  As for what Bridgecrest is specifically being compelled to do, the two options would be to require Bridgecrest to run the proposed searches or to order Bridgecrest to provide access to its databases so Plaintiff's expert can run the searches.  Because both options have their own downsides, the Court will allow Bridgecrest to decide how it wishes to proceed.

…

…

II.    Motion To Extend

A.    **Standard Of Review**

A motion to modify the deadlines set forth in the scheduling order is governed by Rule 16(b)(4)'s "good cause" standard.  *Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 607-08 (9th Cir. 1992).  This "standard primarily considers the diligence of the party seeking the amendment . . . .  If that party was not diligent, the inquiry should end."  *Id.* at 609.

B.    **The Parties' Arguments**

Plaintiff moves to extend all of the certification-related deadlines in the scheduling order.  (Doc. 118.)  The requested length of the extension is, with one exception, 90 days.  (*Id.* at 13-14.)  The exception is the deadline for Plaintiff to provide her expert disclosures related to certification.  Although the original scheduling order stated that this deadline would fall 30 days after the deadline for completing precertification discovery (Doc. 61 at 2-3),  Plaintiff contends that, due to a "scrivener's error" in a previous extension request, it fell only two days after the deadline for completing precertification discovery in the most recent version of the scheduling order.  (Doc. 118 at 13 n.8.)  Thus, Plaintiff asks that this deadline be reset to fall 30 days after the extended deadline for completing precertification discovery.  (*Id.*)  Plaintiff's essential argument is that her extension requests should be granted because she had been diligent in pursuing class discovery, whereas "Bridgecrest never intended to comply with the Order by carrying out the ESI search needed to obtain the class discovery sought in Plaintiff's Discovery Requests" and had the "real goal" of "prevent[ing] Plaintiff from obtaining this critical data by dragging out the process until the class discovery deadline had nearly expired."  (*Id.* at 12 ¶ 20.)

Bridgecrest opposes Plaintiff's extension request.  (Doc. 123.)  As an initial matter, Bridgecrest argues the request is untimely because it is intertwined with the motion to compel, which is also untimely.  (*Id.* at 9-10.)  Bridgecrest further argues the request should be denied because Plaintiff failed to act with diligence.  (*Id.* at 10-14.)  More specifically, Bridgecrest argues that diligence is lacking because (1) Plaintiff unreasonably waited until

June 27, 2022 to propose the two searches, even though Plaintiff had the information necessary to formulate the proposed searches in February and April 2022; and (2) Plaintiff did not meaningfully respond to the objections that Bridgecrest raised on July 19, 2022, but instead waited three weeks and then filed a motion to compel on the eve of the discovery cutoff.  (*Id.* at 10-12.)  Bridgecrest also disputes that it bears any blame for the delays.  (*Id.* at 12-14.)  Finally, Bridgecrest specifically objects to Plaintiff's request to have the expert disclosure deadline fall 30 days (rather than two days) after the new discovery deadline, arguing that Plaintiff was careless in allowing the change to be made in the first place and should have acted sooner to correct it.  (*Id.* at 14-15.)

In reply, Plaintiff reiterates her contention that she has been diligent and that Bridgecrest is to blame for the delays:

> Plaintiff originally requested the class data more than a year ago, the Court then denied Bridgecrest's motion to strike the class allegations to allow class discovery, including Bridgecrest's argument that no discovery should be allowed because Plaintiff cannot certify a class.  Then, after the Court provided the Parties with an additional two months to carry out the ESI search for the class data, Bridgecrest set about ensuring that search never occurred, all the while delaying the process when it never had any intention of producing class discovery.  For example, when Plaintiff sought confirmation she had received all of the records she requested to help create the proposed search terms, Bridgecrest spent the next month giving her the run around.  And despite faulting Plaintiff for refusing to confer about its inability to carry out the ESI search, Bridgecrest offers no insight into why it ignored three separate requests to schedule a joint call with the Parties' respective ESI liaisons to discuss that very topic.

(Doc. 136 at 1-2.)  Plaintiff also offers various reasons why she needed additional time, after receiving some information from Bridgecrest in early 2022, to formulate the searches she proposed in June 2022.  (*Id.* at 3-6.)  As for her purported failure to meet and confer after receiving Bridgecrest's objections to the proposed searches, Plaintiff responds:

> After running through its stock objection about the need to conduct an individualized, result-by-result review to filter out "irrelevant" results—which was . . . a non-issue, given that Plaintiff's expert would be the one conducing the searches—Bridgecrest maintained there was no point doing so because Plaintiff's claim was "inappropriate for class treatment."  Though Bridgecrest faults Plaintiff for failing to respond, there was nothing left to say.

(*Id.* at 7.)  Finally, Plaintiff explains why the resetting of the expert disclosure deadline was

inadvertent and argues that she has been diligent in seeking relief as to that issue.  (*Id.* at 9-10.)

### C.     **Analysis**

Given the analysis in Part I above, little more needs to be said here.  On balance, the Court finds that Plaintiff has been diligent in pursuing precertification discovery and that Bridgecrest bears much (if not all) of the blame for the delays in completing that discovery. Thus, the extension request is granted.  Finally, Bridgecrest's attempt to maintain only a two-day gap between the close of precertification discovery and the deadline for Plaintiff's expert disclosures related to certification, where it is obvious that the parties' original intent was for there to be a 30-day gap and it would make no logical sense to allow only a two-day gap, borders on the petty and is denied.

Accordingly,

**IT IS ORDERED** that:

1.      Plaintiff's motion to compel (Doc. 128) is **granted**.

2.      Plaintiff's motion to extend class deadlines (Doc. 118) is **granted**.  The new deadline to complete class discovery is <u>November 9, 2022</u>.  The new deadline for Plaintiff to submit her expert disclosure is <u>December 12, 2022</u>.  The new deadline for Bridgecrest to submit its expert disclosures is to <u>January 11, 2023</u>.  The new deadline for Plaintiff to submit her rebuttal expert disclosures is <u>February 14, 2023</u>.  The new deadline for the parties to complete expert depositions is <u>March 28, 2023</u>.  The new deadline for Plaintiff to submit her motion for class certification is <u>May 1, 2023</u>.

Dated this 27th day of September, 2022.

_____
Dominic W. Lanza
United States District Judge